## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBEL PERISSA, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>UNITED STATES POLO ASSOCIATION, and USPA PROPERTIES INC., and DOES 1-50, inclusive,<br><br>    Defendants. | Case No. 1:23-cv-10650<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Barbel Perissa ("Plaintiff") brings this action, on behalf of herself and all others similarly situated, against Defendant United States Polo Association, Inc. ("U.S. Polo Association") and Defendant USPA Properties, Inc. (collectively, "Defendants"), and states:

### I.    NATURE OF ACTION

1.    Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendants lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is incorrect when the retailer inflates its prices due to advertised discounts off of some higher, made-

---

[1] "[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price." Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (1992); "[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value" Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. Retailing 115, 118 (1994).

up "original" price that no one ever pays. Defendants have continually advertised false price discounts for merchandise sold throughout their retail and outlet stores (hereinafter sometimes referred to collectively as "retail stores"). This class action seeks monetary damages, restitution, and declaratory and injunctive relief from Defendants arising from their deceptive business practice of advertising fictitious "original" prices and corresponding phantom discounts on apparel, accessories, watches, and other items sold in their retail stores.

2.      False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the true market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[2] Consequently, false reference pricing schemes enable retailers, like Defendants, to sell products above their true market price and value—and consumers are left to pay the inflated price. Consumers are thus damaged by not receiving the promised discounts for products advertised with false reference pricing.

3.      The following example of a hypothetical DVD seller, which is parallel to Defendants' deceptive business practice, illustrates the illegal false reference pricing scheme and its attendant harm to consumers. A seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly offer the DVD and make a profit. Instead, however, the seller creates a "original" price for the DVD of $100.00

---

[2] Dhruv Grewal & Larry D. Compeau, Comparative Price Advertising: Informative or Deceptive?, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

and advertises the DVD as "on sale" at *90% off* rendering the ***"sale" price*** of the DVD $10.00. When a consumer purchases the DVD, he presumes he got a "good deal" on a DVD previously sold—i.e., valued by others in the market—at an "original" price of $100.00. The consumer's presumption and purchase stem directly from the seller's purposeful deception. For example, if the seller tried to sell that same DVD for $10.00 *without* referencing a false original price of $100.00, and the attendant 90% off discount, that seller would not be able to sell any DVDs at $10.00 because the true, original market price of the DVD is $5.00. In contrast, by presenting consumers with a false "original" price of $100.00, consumers will purchase the DVD at $10.00; the seller thus has fabricated an increase in demand for the DVD through the ***perceived value*** of both the DVD itself and the substantial discount of $90.00. Consumers' increased willingness and demand to pay $10.00 for the DVD will in turn impact the overall market price of the DVD. Therefore, the seller can create a false market price for the DVD at $10.00 by advertising a false "original" price and a corresponding phantom discount of 90% off. Plaintiff's case seeks to remedy this deception, its attendant harm to consumers, and that disparity—the inflated market price through Defendants' application of an illegal discounting scheme compared to the lower, more accurate market price without any false reference pricing.

4.      Through their false and misleading marketing, advertising, and pricing scheme alleged herein, Defendants violated, and continue to violate, New York and federal law. Specifically, Defendants violated and continue to violate: New York Consumer Protection from Deceptive Acts and Practices Act, N.Y. GBL § 349, *et seq.* (the "NYDAPA"), New York False Advertising Act, N.Y. GBL § 350, *et seq.* (the "NYFAA"), as well as the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

5.      Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased one or more apparel items, accessories, and other items at Defendants' retail stores that were deceptively represented as discounted from a falsely advertised reference price. Plaintiff seeks to halt the dissemination of this false, misleading, and deceptive pricing scheme, to correct the false and misleading perception it has created in the minds of consumers, and to obtain redress for those who have overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to enjoin Defendants from using false and misleading misrepresentations regarding former price comparisons in their labeling and advertising permanently. Further, Plaintiff seeks to obtain damages, restitution, reasonable costs and attorney's fees, and other appropriate relief in the amount by which Defendants were unjustly enriched as a result of their sales of merchandise offered a false discount.

## II.      JURISDICTION AND VENUE

6.      This Court has original jurisdiction of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and at least some members of the proposed Class (defined below) have a different citizenship from Defendants.

7.      The Southern District of New York has personal jurisdiction over Defendants because Defendant U.S. Polo Association is a not-for-profit corporation or other business entity which does conduct business in the State of New York; and Defendant USPA Properties, Inc. is a corporation or other business entity which does conduct business in the State of New York. Defendants conduct sufficient business with sufficient minimum contacts in New York, and/or otherwise intentionally avail themselves to the New York market through the operation of an outlet store within the State of New York.

8.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants transact substantial business in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and Defendants' misconduct alleged herein occurred in this District.

### III.    GENERAL ALLEGATIONS

**A.    Retailers Benefit from False Reference Pricing Schemes.**

9.    Defendants engage in a false and misleading reference price scheme in the marketing and selling of their merchandise at their retail and outlet stores.

10.    Retailers, including Defendants, substantially benefit from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions. The information available to consumers varies for different types of products.[3] Nonetheless, consumers frequently lack full information about products and as a result often use information from sellers to make purchase decisions.[4]

11.    Defendants' deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[5] In other words, consumers view Defendants' deceptive advertised reference prices as a

---

[3] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (*e.g.*, style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (*e.g.*, longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (*e.g.*, whether the shirt's cotton was produced using organic farming methods). Darby, Michael R., and Edi Karni. "Free Competition and the Optimal Amount of Fraud." *The Journal of Law and Economics* 16 no. 1 (1973): 67-88, pp. 68-69.

[4] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Nelson, Phillip. "Information and Consumer Behavior." *Journal of Political Economy* 78, no. 2 (1970): 311-29, pp. 311-12.

[5] Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 54. Also see Thaler, Richard.

proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[6] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[7] Under this concept, coined as "transaction utility" by Nobel Prize-winning economist Richard Thaler, consumers place some value on the psychological experience of obtaining a product at a perceived bargain.[8]

      12.    Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[9] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment"

---

"Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[6] Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 52.

[7] Darke, Peter and Darren Dahl. "Fairness and Discounts: The Subjective Value of a Bargain." *Journal of Consumer Psychology* 13, no 3 (2003): 328-338, p. 328.

[8] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'". Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 205.

[9] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 68.

(e.g., a "suggested retail price," or other comparative sale price).[10] Researchers report that consumer's internal reference prices adjust toward external reference prices when valuing a product.[11] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[12] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[13] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[14] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price

---

[10] Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 62.

[11] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, p. 48.

[12] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Thaler, Richard. "Mental Accounting and Consumer Choice." Marketing Science 4, no. 3 (1985): 199-214, p. 212.

[13] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

[14] Kalyanaram, Gurumurthy, and Russell S. Winer. "Empirical Generalizations from Reference Price Research." *Marketing Science* 14, no. 3 (1995): G161-G169, p. G161. *See also* Gotlieb, Jerry B. and Cyndy Thomas Fitzgerald. "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product." *Journal of Applied Business Research* 6, no. 1 (1990): 59-69, at pp. 65-66. ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][15]

13.     Retailers, including Defendants, understand that consumers are susceptible to a perceived bargain, and therefore, they have a substantial financial interest in making consumers believe they are receiving a bargain, even if they are not. Contrary to the illusions of bargains in Defendants' advertisements, consumers are actually overpaying for Defendants' products and not receiving any promised discounts due to the relationship between Defendants' deceptive price comparisons, consumer purchase decisions, and the economic principles of demand and price.

**B.     Defendants' Fraudulent Price Discounting Scheme Violates New York State Law and Federal Regulations.**

14.     Defendants have continually engaged in a false reference pricing scheme injurious to consumers by advertising apparel, accessories, and other items at discounted, "sale" prices. Defendants marketed the "sale" prices as discounts from the "original" prices set forth on the products' price tags for U.S. Polo Association merchandise sold at Defendants' retail stores. However, the advertised discounts are nothing more than phantom markdowns because (1) the represented "original" prices, *i.e.,* the prices listed on the price tags for the merchandise, are artificially inflated; (2) the products are never offered for sale at the full original price for any substantial period of time, (if at all); and (3) the original prices are never the true market price for the products Defendants sell.

15.     Defendants mark each item with a price tag that sets forth the "original" price at which the item was purportedly offered for sale. That original price is printed on the item's price tag. Defendants then display large sale-discount signage on top of or alongside each rack of clothing or accessories, advertising a "discounted % off," or a discounted whole-price reduction

---

[15] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

for the item, which is substantially less than the original price listed on the price tag. The products were never sold at the "original" or "price tag" prices. Thus, the advertised reference price is false and used solely to induce consumers into believing that the merchandise was once sold at the reference price from which the false, "discounted," corresponding sale price is derived.

16.    The percentage-off discounts advertised in Defendants' retail stores promise to consumers that if they purchase certain items, then they will receive a specific percentage-off discount on those items, which are represented as being valued at their higher advertised "original" price. In actuality, the percentage-off discounts are not true discounts as they are applied to an advertised "original" price that was completely fabricated by Defendants and that does not represent a price at which Defendants regularly sold the item in the normal course of business. Consequently, consumers do not receive the discount they were promised by Defendants when they purchase items from Defendants at a purportedly discounted price.

17.    Defendants convey their deceptive pricing scheme to consumers through promotional materials, in-store displays, and print advertisements. For example, in Defendants' retail stores, the pricing scheme is prominently displayed, advertising deep discounts on various items throughout the store.

18.    Defendants' pricing scheme is intended to increase sales but has the effect of depriving consumers of the benefit of their bargain. The clothing items and attire listed at "regular" or "original" prices were never offered for sale at those prices for a substantial period of time. The original or price tag price is not the price at which Defendants expect to sell their merchandise; it is merely a basis for misleading consumers into believing they are receiving a substantial discount from the false original price.

19.    Defendants sell their own, exclusive, branded products in their retail and outlet stores. Thus, there is no regular or market price for many of the products being sold at their retail stores other than the price set by Defendants at those stores. There is no meaningful difference between Defendants' outlet and retail stores, nor their online e-commerce website in that the same products are sold at every store and online and the same fraudulent pricing scheme is deployed uniformly. There is no other market for the U.S. Polo Association outlet store clothing other than at the U.S. Polo Association outlet stores. The difference between the "sale" and "regular" prices offered at both the retail and outlet stores is a false savings percentage or dollar discount used to lure consumers into purchasing artificially inflated, overpriced products.

20.    Nowhere in Defendants' stores do Defendants disclose that the reference or original prices used are not: 1) former prices; or 2) recent, regularly offered former prices; 3) or prices at which identical products are sold elsewhere in the market. Nor do Defendants disclose any date at which the original prices were offered in the market. The omission of these disclosures, coupled with Defendants' use of fictitious advertised reference prices, renders Defendants' pricing inherently misleading to reasonable consumers, including the Plaintiff.

21.    The advertised reference prices are false and induce consumers into believing that U.S. Polo Association merchandise was once sold at the reference price, in the near term, and will be again if the consumer does not make a purchase at the "bargain" price. Defendants engage in this practice knowing full well that the advertised products are never actually offered or sold at the advertised reference prices.

22.    Furthermore, Defendants advertise the false reference prices to induce consumers into believing that U.S. Polo Association merchandise is worth the inflated, false reference price

such that the lower "sale" price represents a limited time discount. Customers, however, do not enjoy any such advertised discount when they purchase items from Defendants' retail stores.

23.     Defendants advertise constant discounts in their retail stores for nearly all items they offer for sale, and their employment of perpetual false discounts deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information. Consumers have no way of discerning that Defendants' pricing and discount representations throughout their retail stores are false and misleading.

24.     Defendants' systematic and pervasive pricing policy and conduct, as described herein, is in direct violation of federal pricing regulations.

25.     Under federal regulations, Defendants' advertised discounts were fictitious because the reference prices did not represent a *bona fide* price at which Defendants previously sold or offered to sell the products, on a regular basis, for a reasonably substantial period of time, as required by the FTC. *See* 16 C.F.R. § 233.1 *et seq.*

26.     Defendants' perpetual discounting of their retail and outlet merchandise constitutes false, fraudulent, and deceptive advertising because the "original" reference price listed is substantially higher than those prices actually offered by Defendants. The reference prices are a total fiction used exclusively as a benchmark from which the false discount and corresponding "sale" price is derived. Defendants' scheme has the effect of tricking consumers into believing they are getting a significant deal by purchasing U.S. Polo Association merchandise at a steep discount, when, in reality, consumers are now overpaying for U.S. Polo Association merchandise. Defendants' deceptive pricing scheme has artificially raised the prices actually paid by consumers by creating the false impression of a bargain.

27.    The process of how Defendants' false reference pricing scheme injures consumers proceeds as follows. Defendants advertised their merchandise with false reference prices, which then caused consumers to be deceived into overvaluing those products. As a result, consumers' demand for the U.S. Polo Association merchandise has artificially increased. This artificial, illusory increase in consumers' demand further resulted in an increase in the price of Defendants' U.S. Polo Association merchandise. This resultant price increase has been reflected in the "discounted sale" price at which consumers, including Plaintiff, paid for the U.S. Polo Association merchandise. Consumers thus unknowingly purchased the U.S. Polo Association merchandise at inflated prices all caused by Defendants' deceptive false reference pricing scheme. The U.S. Polo Association merchandise is worth less than the inflated prices at which they are offered as a "discount." Without the false reference pricing scheme, the U.S. Polo Association merchandise would *not* command the higher, inflated prices. Consumers, like the Plaintiff here, have therefore overpaid for U.S. Polo Association merchandise—which, to circle back, was caused by Defendants' deception.

28.    Thus, Defendants' scheme intends to and does provide harmful misinformation to customers. This misinformation communicates to consumers, including Plaintiff, that the products sold in Defendants' stores have a greater value than the advertised discounted price.

**C.    Defendants' Fraudulent Price Discounting Scheme Harms All Consumers**

29.    All consumers are harmed by Defendants' conduct as alleged herein. The impact of Defendants' conduct pervades the entire market for their U.S. Polo Association merchandise irrespective of individual consumer's beliefs or purchasing decision processes because, as explained below, the artificially increased demand generated by Defendants' false reference pricing scheme results in increased actual sales prices beyond the prices Defendants could

command in the absence of the false reference pricing scheme. Accordingly, consumers' subjective beliefs about the value of U.S. Polo Association merchandise are inconsequential to the injury they face when purchasing said merchandise. To be harmed by Defendants, it matters not whether consumers believe they will receive a discount on U.S. Polo Association merchandise when they purchase it, nor does it matter why consumers purchased U.S. Polo Association merchandise. Likewise, consumers need not have any certain perceptions about Defendants' pricing nor need they any insight into the true market prices for apparel, accessories, and other related items to have been harmed by Defendants' false discount pricing scheme.

30.    When consumers purchase U.S. Polo Association products, they will all overpay and they will all not receive the benefit of the promised discounts. The process of how Defendants' false reference pricing scheme injures consumers demonstrates how all consumers are harmed. In short, Defendants' false reference pricing caused an illusory, artificial increase in the demand and attendant price for U.S. Polo Association merchandise resulting in all consumers, including Plaintiff, having no choice but to overpay for said merchandise at the resultant inflated prices. When consumers like Plaintiff now purchase U.S. Polo Association merchandise, the merchandise is worth less than the inflated price at which it is purchased.

31.    A product's reference price matters to consumers because it serves as a baseline upon which consumers perceive a product's value.[16] Empirical studies thus "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[17] As to Defendants' products, consumers are

---

[16] Thaler, Richard, "Mental Accounting and Consumer Choice," *Marketing Science* 4, no. 3 (1985): 199-214, at p. 212.

[17] Gotlieb, Jerry B. and Cyndy Thomas Fitzgerald. "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product." *Journal of Applied*

misled and incorrectly overvalue them due to Defendants' false price comparisons. The price at which consumers purchase Defendants' products reflects consumers' overvaluation of the products as Defendants can get away with commanding an inflated price due to this overvaluation. Academic researchers have documented this relationship between reference prices, and consumers' attendant behaviors and the harm inflicted on them by deceptive retailers as follows:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[18]

32.    To further explain, the false pricing information in Defendants' advertisements, in-store displays, and promotional materials first caused consumers to perceive they were receiving a bargain on U.S. Polo Association merchandise when purchased at its "sale" price. This consumer perception resulted in these consumers gaining an additional "transaction value"[19] for their U.S.

---

*Business Research* 6, no. 1 (1990): 59-69, at p. 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at p. 60.

[18] Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, at p.46.

[19] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'." Thaler, Richard. "Mental Accounting and Consumer Choice." Marketing Science 4, no. 3 (1985): 199-214, p. 205; Dhruv Grewal & Larry D. Compeau, Comparative Price Advertising: Informative or Deceptive?, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." Journal of Public Policy & Marketing 18, no. 1 (1999): 3-10, p. 7.

Polo Association purchases, which they would not have otherwise gained absent Defendants' false reference pricing scheme. Consumers' valuation of U.S. Polo Association merchandise thus increased. This increase in consumers' perceived valuation of U.S. Polo Association merchandise then caused an artificial increase in the aggregate demand of said merchandise. This artificial increase in the aggregate demand then caused an attendant illusory increase in the price of U.S. Polo Association merchandise. Defendants' false reference pricing scheme has thus disrupted the natural market for their U.S. Polo Association merchandise, and Defendants have been able to charge all consumers inflated prices, as reflected in both the "sale" and "original" prices. Everyone is now forced to pay above-market prices for U.S. Polo Association merchandise should they decide to make a purchase at any of Defendants' retail or outlet stores. All consumers will thus pay an inflated price for U.S. Polo Association products regardless of the reason for their purchase.

33.    Fundamental economics concepts and principles provide a foundation upon which the uniform harm of Defendants' false reference pricing scheme is based. One such principle is that cost and demand conditions determine market prices all consumers pay for products.[20] The aggregate demand curve for a product, including those sold by Defendants, represents consumers' valuation of the product, and as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, the market price for the product will increase. Specific individual's willingness to pay for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

---

[20] "[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace" (Mankiw, N. *Essentials of Economics.* Eighth Edition. Boston, MA: Cengage Learning, 2015, at p. 66). *See also,* Varian, Hal R. *Microeconomics Analysis.* Third Edition. New York, NY: W. W. Norton & Company, 1992, at pp. 23-38, 144-157, 233-353, and 285-312.

34.     Therefore, Defendants' conduct alleged herein has impacted the market prices of their U.S. Polo Association products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant inflation in U.S. Polo Association prices. Economic theory ensures that as the aggregate demand curve for U.S. Polo Association merchandise moved outward, all consumers must pay a higher price for U.S. Polo Association products than they would have paid absent Defendants' false reference pricing scheme. Plaintiff and members of the proposed Class thus suffered a common impact from Defendants' ability to sell U.S. Polo Association merchandise at inflated prices and it was Defendants who caused the inflation and chose to sell their U.S. Polo Association products at the inflated prices—and who continue to sell U.S. Polo Association products at inflated prices to the detriment of all purchasers.

**D.     Investigation**

35.     Plaintiff's counsel has conducted a large-scale, comprehensive investigation into Defendants' pricing practice. Plaintiff's counsel first tracked items in Defendants' outlet stores beginning in July of 2019 and concluding in December of 2019. Every product in Defendants' stores remained on sale for the duration of this tracking period, discounted against a false reference price. Plaintiff's investigators observed U.S. Polo Association stores throughout New York and other states. The prices on Defendants' products were uniform at every location and on the Defendants' e-commerce website, "uspoloassn.com." Plaintiff's counsel again initiated a similar investigation in Defendants' outlet stores and its retail stores, and cross referenced the prices against its online, e-commerce store from September of 2021 through January of 2022. That investigation revealed the same results—every product, at every location, including on Defendants' website, was continuously discounted against a false reference price. Plaintiff initiated a third investigation in January of 2022 through July of 2022. Again, same results. *See* **Exhibit A**,

list of exemplar products from the 2022 investigation. After determining that the discounted prices and fraudulent pricing scheme deployed in the Defendants' retail stores was identical to the product offerings and pricing practices online, Plaintiff's counsel initiated a full scale online investigation, tracking every single item offered for sale by Defendants on a daily basis from July 27, 2022 through December 27, 2022. *See* **Exhibit B**, sample data from 2022 online investigation from July 27 to December 27, 2022.

36.     Plaintiff's counsel's investigation revealed that the "original" or "price tag" price of the items Plaintiff purchased was never the true market price at U.S. Polo Association retail stores or its e-commerce store preceding Plaintiff's purchases. Instead, Defendants continuously offered the items for sale at the falsely "discounted" prices, including those products purchased by Plaintiff. Plaintiff's counsel's investigation revealed that this was a pervasive practice at the U.S. Polo Association stores, as hundreds of items remained continuously discounted from their "original" or "price tag" price and they were not offered for sale at their original price. Defendants engage in a systematic scheme to continuously "discount" their merchandise without ever offering the merchandise for sale at their "original" or "price tag" prices.

37.     As far back as July 29, 2019, all types of polo shirts were offered at a discount that compared a regular price ($38.00 or $42.00) to a "sale" price for two of the same items (2 for $34.99 or $19.99) in U.S. Polo Association retail stores.

38.     To reiterate, Plaintiff's investigation of Defendants' retail and outlet stores revealed that their merchandise is priced uniformly. That is, merchandise sold at Defendants' stores bear a price tag with a false original price and a substantially discounted "_____% Off," sale price. Plaintiff's counsel's investigation confirmed that the merchandise purchased by Plaintiff was

priced with a false reference price and a corresponding discounted price, which was in fact an inflated price.

39.    Plaintiff's counsel's investigators were tracking the pricing of merchandise offered for sale at U.S. Polo Association stores beginning in early 2019. The investigation revealed that items listed for sale in the U.S. Polo Association stores were never offered for sale at their full "original" price. Plaintiff's counsel's investigators visited U.S. Polo Association stores in New Jersey nearly every day to verify the prices being offered on the U.S. Polo Association merchandise. The pricing scheme was uniform and identical across all stores visited in New Jersey. The only thing that changed was the requisite % off on certain merchandise items.

40.    Therefore, the "original" prices on the merchandise sold at the U.S. Polo Association stores are either false original prices or severely outdated prices that have never been offered in the relevant market.

41.    Despite Plaintiff's counsel's best efforts at investigation, the full extent of Defendants' false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in the possession of Defendants.

## IV.    PARTIES

### Plaintiff

42.    Barbel Perissa resides in Manhattan, New York. On June 2, 2022, Plaintiff went shopping for some new clothes at the U.S. Polo Association Outlet located at 661 Racetrack Lane, Central Valley, New York 10917 (the "Woodbury Common Outlet"). In reliance on Defendants' false and deceptive advertising, marketing and discount pricing scheme, Plaintiff purchased the following items from the Woodbury Common Outlet on June 2, 2022:

| No. | Item: | False Reference Price: | Sale Price paid by Plaintiff: |
|---|---|---|---|
| 1 | 786665736606 – CREW NECK TEE-06 | $20.00 | $11.00 |

| No. | Item: | False Reference Price: | Sale Price paid by Plaintiff: |
|---|---|---|---|
| 2 | 786660188998 – CREW NECK TEE-06 | $20.00 | $11.00 |
| 3 | 786660188783 – CREW NECK TEE-06 | $20.00 | $11.00 |
| 4 | 786660177077 – SM PONY CREW T-04 | $26.00 | $11.00 |
| 5 | 786664456321 – SM DHM CREW T | $26.00 | $11.00 |
| 6 | 786664459124 – CREW NECK TSHIRT-04 | $26.00 | $11.00 |

43. Plaintiff examined several items at the Woodbury Common Outlet before deciding on what items to purchase. After reviewing the advertised sale prices for the six items listed above, Plaintiff examined the items further and picked out sizes that she knew would fit. During her time at the Woodbury Common Outlet on June 2, 2022, Plaintiff noticed numerous signs within the store advertising "30%, 40% and 50% Off" discounts on various items throughout the store.

44. After observing the original prices of the items and the accompanying sale prices, Plaintiff believed she was receiving a significant discount on the items she had chosen. Because she liked the items, felt that the discounted price would likely not last, and believed she was getting a significant bargain on the merchandise, she proceeded to the register and purchased the products. The discounts were a material representation to Plaintiff, and she relied upon them in making her purchase decision. She paid a total of $568.72 for the products. However, Plaintiff did not receive the benefit of her bargain.

45. Plaintiff would not have made her purchases without the misrepresentations made by Defendants. As a result, Plaintiff has suffered economic injury as a direct result of Defendants' unlawful, unfair, and fraudulent conduct.

**Plaintiff's Damages**

46. Plaintiff has been injured and incurred quantifiable actual damages as a result of Defendants' fraudulent pricing scheme, which can be and have been preliminarily calculated through the use of regression analysis.

47. Plaintiff overpaid for the products she purchased as described herein. And it was Defendants' false reference pricing scheme and attendant deception that caused Plaintiff to

overpay. Despite Plaintiff's original beliefs that the products she purchased were discounted and thus that their value was significantly greater than the sale price for which she purchased them, Plaintiff, in actuality, paid an *inflated* price for the products she purchased.

48.    As for Plaintiff, both the "original" price of $20.00 and the sale price of $11.00 for the three "CREW NECK TEE-06" items Plaintiff purchased were inflated. Likewise, both the "original" price of $26.00 and the sale price of $11.00 for the other three items Plaintiff purchased were inflated. The shirts she purchased were all worth less than the amount Plaintiff paid for each of them. If Defendants had not employed the falsely advertised "original" prices for the six items Plaintiff purchased, then those six items would not have commanded such a high, inflated price.

49.    Plaintiff was damaged in her purchases because Defendants' false reference price discounting scheme inflated the final selling price of the items she purchased, such that Defendants' false reference price discounting scheme caused Plaintiff to pay a price premium. Defendants' false reference price discounting scheme artificially inflated consumer demand, such that each consumer who purchased the corresponding product paid higher prices when compared to what they would have paid had Defendants not engaged in a false reference pricing scheme. Plaintiff would not have purchased the merchandise, or would have paid less for it, but for Defendants' representations regarding the false reference prices and purported discounts of the merchandise. Plaintiff was misled into believing that she was receiving substantial savings on the purchases of Defendants' products which was implied by the falsely advertised reference prices.

50.    In this specific case, for the purpose of establishing damages, Plaintiff's counsel's investigators tracked the pricing of merchandise offered for sale on Defendants' website for more than 90 days, beginning in July of 2022. The investigation confirmed what Plaintiff's counsel had

previously observed, that items listed for sale online were never offered for sale at their full "original" reference price.

51.    In total, the investigation tracked over 18,000 price observations for over 645 unique products and found that the reference price exceeded the actual selling price in 100% of cases. On average, the reference price was $44.82, whereas the actual average selling price of the item was $20.53. Defendants therefore deceptively overstated the value of these products by an average of $24.29, or 118.3%. Defendants' deceptive scheme occurred across every category of products offered online (shirts, jackets, jeans, etc.).

52.    The investigation also revealed a quantitative relationship between the false reference price and the actual selling price of items on Defendants' website. In this case, the investigation utilized "regression analysis" to statistically measure the relationship between Defendants' actual selling prices and the higher, false reference prices advertised by Defendants. Regression analysis is a statistical tool used by economists, statisticians, and scientists to estimate the quantitative relationship between two or more variables. Regression analysis is widely used by damages experts in litigation to establish a causal link between the defendant's misconduct and damages suffered by plaintiff.

53.    Utilizing regression analysis, the pricing data collected during the investigation revealed that for every $1 increase in the false reference price, the selling price increased by $0.36—in other words, a positive coefficient of 0.36. This effect was statistically significant, meaning that it was not simply due to chance. In addition, the positive relationship between the selling price and the reference price remained even after controlling for other features that influence the selling price of an item (e.g., type of product and specific product characteristics). Defendants' own data demonstrates a clear connection between their misconduct and the prices

paid by members of the proposed Class: the higher the advertised reference price advertised, the more consumers pay for the product. As a result, Class members unknowingly pay a price premium due to Defendants' misconduct.

54.    The price premium paid by members of the proposed Class can be preliminarily demonstrated using the data and findings of Plaintiff's investigation. Given that Defendants deceptively overstated the value of their products by an average of $24.29, and the fact that every $1 increase in the reference price resulted in a $0.36 increase in the selling price, this implies that Class members paid an average overcharge of $8.74, or 42.6% of the average purchase price.[21] Although this investigation is ongoing and preliminary, the data collected thus far clearly demonstrates that Plaintiff and the proposed Class were harmed through paying a price premium that was caused by Defendants' deceptive and false reference price discounting scheme. Plaintiff intends to seek in-depth discovery of documents and data to supplement this initial investigation and will prove damages with reasonable certainty at trial.

55.    The table below shows the application of the preliminary coefficient to select items[22] purchased by Plaintiff and the resulting damages.

| Plaintiff | Item | Co-Efficient | Damages |
|-----------|------|--------------|---------|
| Perissa | 786665736606 – CREW NECK TEE-06 Reference Price: $20.00 Sale Price: $11.00 | 0.36 | $3.24[23] |

---

[21] To further explain, the average overcharge ($8.74) was calculated by multiplying the average difference between Defendants' actual sales price and false reference price ($24.29) with the amount that the selling price increased for every $1 increase in the reference price ($0.36). I.e.: $24.29 x $0.36 = $8.74.

[22] As the Court will see, this exercise can easily be done for every product purchased by multiplying the coefficient by the difference between the item's reference price and actual sales price.

[23] $20.00—$11.00=$9.00. $9.00 x 0.36=$3.24.

56.     Accordingly, objective measures demonstrate that Plaintiff overpaid for the U.S. Polo Association merchandise she purchased. The difference between the sale price paid by Plaintiff due to the artificially increased demand for the products—caused by Defendants' false reference pricing scheme—and the market sale price that the products would have commanded without Defendants' deception provides an objective measure by which Plaintiff was overcharged and injured by Defendant. The amount of inflation of the prices for the U.S. Polo merchandise Plaintiff purchased caused by Defendants' deception thus measures how much Plaintiff overpaid. As shown forth above, this amount can be quantified using regression analysis based on Defendants' historic pricing data. Plaintiff's allegations therefore sufficiently allege a "connection between the misrepresentation and any harm from, or failure of, the product." *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 56 (1999). *See also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (requiring allegations that, "on account of a materially misleading practice, [plaintiff] purchased a product and did not receive the value of her purchase") (emphasis added).

57.     Plaintiff is susceptible to this reoccurring harm because she cannot be certain that Defendants have corrected this deceptive pricing scheme and she desires to shop at Defendants' stores in the future. The U.S. Polo Association retail stores also offer seasonal apparel items that are only offered during certain times of the year, and they often offer new merchandise for sale that Defendants have not sold before. Due to the enormous, fluctuating variety of styles and sizes of merchandise offered at U.S. Polo Association retail stores, Plaintiff will be unable to parse what prices are inflated and untrue, and what prices are not.

58.     Plaintiff would like to purchase different U.S. Polo Association apparel items in the future other than the items she purchased as described herein; however, Plaintiff does not know if Defendants will accurately or inaccurately represent the true prices for the distinct apparel items she would like to buy in the future. In particular, Plaintiff is not as knowledgeable about Defendants' pricing practices with regards to its apparel items. Therefore, Plaintiff cannot be

certain of the veracity or falsity of Defendants' advertised bargains for the wide selection of apparel and retail products offered at Defendants' retail stores. Plaintiff may again purchase a falsely discounted product at one of the U.S. Polo Association stores under the reasonable impression that the advertised reference price represented a *bona fide* former price at which the item was previously offered for sale by Defendants.

**Defendants**

59.     Plaintiff is informed and believes, and upon such information and belief allege, Defendant U.S. Polo Association, Inc., is an Illinois not-for-profit corporation with its principal executive offices in Lake Worth, Florida. Plaintiff is informed and believes that U.S. Polo Association owns and operates U.S. Polo Association retail and outlet stores in New York, and advertises, markets, distributes, and/or sells clothing and clothing accessories in New York, and throughout the United States.

60.     Plaintiff is informed and believes, and upon such information and belief allege, Defendant USPA Properties, Inc., is an Illinois corporation with its principal executive offices in West Palm Beach, Florida. Plaintiff is informed and believe that USPA Properties, Inc. is a wholly owned subsidiary of U.S. Polo Association, Inc., and that USPA Properties, Inc. manages the U.S. Polo Association Inc. retail brand.

61.     Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sue such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief allege, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiff and members of the proposed Class as alleged herein. Plaintiff will amend this Complaint to set forth

the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

62.    The reference prices listed and advertised on products sold at Defendants' stores are false reference prices, utilized only to perpetuate Defendants' false discount scheme.

63.    Defendants know that their reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under New York and federal law.

64.    Defendants fraudulently concealed from and intentionally failed to disclose to Plaintiff and other members of the proposed Class the truth about their advertised discount prices and former reference prices. Defendants concealed from consumers the true nature and quality of the products sold at their retail and outlet stores.

65.    Defendants intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiff and the proposed Class to purchase U.S. Polo Association products in their retail and outlet stores.

66.    At all relevant times, Defendants have been under a duty to Plaintiff and the Class to disclose the truth about their false discounts.

67.    Plaintiff reasonably relied upon Defendants' artificially inflated reference prices and false discounts when purchasing the items described herein, at Defendants' retail stores. Plaintiff would not have made such purchases but for Defendants' representations of fabricated "original" prices and false discounts being offered on the merchandise she purchased.

68.    Plaintiff and the Class reasonably and justifiably acted and relied on the substantial price differences that Defendants advertised, and made purchases believing that they were receiving a substantial discount on items of greater value than their actual value. Plaintiff, like

other Class members, were lured in, relied on, and were damaged by the deceptive pricing scheme

that Defendants carried out.

## IV.    CLASS ALLEGATIONS

69.    Plaintiff brings this action on behalf of herself and all other similarly situated Class

members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and

seeks certification of the following Class against Defendants:

> All persons, within the State of New York, who, within the applicable statute of
> limitations preceding the filing of this action (the "Class Period"), purchased from
> a New York U.S. Polo Association retail store, one or more products at discounts
> from an advertised reference price and who have not received a refund or credit
> for their purchase(s).

Excluded from the Class are Defendants, as well as their officers, employees, agents or affiliates,

parent companies and/or subsidiaries, and each of their respective officers, employees, agents or

affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit,

modify, or amend the Class definition, including the addition of one or more subclasses, in

connection with their motion for Class certification, or at any other time, based upon, *inter alia*,

changing circumstances and/or new facts obtained during discovery.

70.    ***Numerosity***: The Class members are so numerous that joinder of all members is

impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of

thousands of individuals who have been damaged by Defendants' conduct as alleged herein. The

precise number of Class members is unknown to Plaintiff.

71.    ***Existence and Predominance of Common Questions of Law and Fact***: This action

involves common questions of law and fact, which predominate over any questions affecting

individual Class members. These common legal and factual questions include, but are not limited

to, the following:

a.      whether, during the Class Period, Defendants used falsely advertised reference prices on their U.S. Polo Association product labels and falsely advertised price discounts on merchandise sold in their retail and outlet stores;

b.      whether Defendants ever offered items for sale or sold items at their advertised reference price;

c.      whether Defendants' purported sale prices advertised in their retail stores reflected any actual discounts or savings;

d.      whether Defendants' purported percentage-off discounts advertised in their retail stores reflected any actual discounts or savings;

e.      whether Defendants' alleged conduct constitutes violations of the laws asserted;

f.      whether Defendants' alleged conduct constitutes violations of federal pricing regulations;

g.      whether Defendants engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

h.      whether Plaintiff and Class members are entitled to damages and the proper measure of that loss; and

i.      whether an injunction is necessary to prevent Defendants from continuing to use false, misleading or illegal price comparisons.

72.     ***Typicality***: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendants' false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class members.

73. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interest to those of the Class.

74. **Superiority**: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendants will be permitted to retain the proceeds of their fraudulent and deceptive misdeeds.

75. All Class members, including Plaintiff, were exposed to one or more of Defendants' misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendants' consistent false sale prices, advertising scheme, disseminated in a years-long campaign to New York consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendants' false advertising scheme when purchasing merchandise sold at the U.S. Polo Association retail store.

76.     Plaintiff is informed that Defendants keep extensive computerized records of their U.S. Polo Association customers through, *inter alia*, customer loyalty programs and general marketing programs. Defendants have one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## V.      CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of the New York Consumer Protection From Deceptive Acts and Practices Act
("NYDAPA")
N.Y. GBL § 349, *et seq.***

77.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

78.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for violations of the New York Deceptive Acts and Practices Act ("NYDAPA"), N.Y. GEN. BUS. LAW § 349.

79.     NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

80.     Plaintiff and members of the proposed Class are "persons" under NYDAPA, N.Y. GEN. BUS. LAW § 349(h), and Defendants' actions as set forth herein occurred in the conduct of "business, trade or commerce" under NYDAPA.

81.     In the course of its business, Defendants advertised false reference prices that gave consumers, including Plaintiff and members of the proposed Class, the impression that its products were regularly sold on the market for a substantially higher price than they actually were; therefore,

leading to the false impression that the products sold at Defendants' retail stores were worth more than they actually were.

82.    Plaintiff and members of the proposed Class had no way of discerning that Defendants' representations were false and misleading.

83.    Defendants thus violated and continue to violate NYDAPA by making statements that, when considered as a whole from the perspective of a reasonable consumer, give the false impression that the products sold at Defendants' retail stores are worth more than they actually are.

84.    Defendants knew or should have known that their conduct violated NYDAPA and owed a duty to Plaintiff and members of the proposed Class to refrain from engaging in deceptive acts or practices, and to disclose the truth about their false discounts.

85.    Defendants intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the prices of their apparel and retail products with intent to mislead Plaintiff and members of the proposed Class.

86.    Defendants' misleading and false advertisements were material to Plaintiff and members of the proposed Class, as they relate to the price of the product the consumer is receiving and paying for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the product.

87.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and members of the proposed Class, about the price of their apparel and other retail products. Plaintiff and members of the proposed Class reasonably relied upon Defendants' artificially inflated reference prices and false discounts when purchasing the apparel and retail products from Defendants' retail stores. Plaintiff and members of the proposed Class would not have made such purchases but for Defendants' representations regarding the substantial discount being offered for the products.

88.    Defendants' violation of NYDAPA, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff, members of the proposed Class, and the public will be deceived into purchasing products based on price

comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and led to financial damage for consumers like Plaintiff and members of the proposed Class.

89.    As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive and unfair acts and practices made during the course of Defendants' businesses, Plaintiff and members of the proposed Class suffered ascertainable loss and actual damages.

90.    Plaintiff and members of the proposed Class are entitled to all of the damages, remedies, fees, and costs available under NYDAPA, including but not limited to, injunctive relief, recovery of actual damages and/or fifty dollars in statutory damages, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

### SECOND CAUSE OF ACTION

**Violation of the New York False Advertising Law ("NYFAA")**
**N.Y. GBL § 350, *et seq.***

91.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

92.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for violations of the New York False Advertising Act ("NYFAA"), N.Y. GEN. BUS. LAW § 350.

93.    The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity . . ." N.Y. GEN. BUS. LAW § 350(a).

94.    Defendants' routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendants' actual sale price), constitutes an unfair, untrue, and

misleading practice. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendants' retail stores were worth more than they actually were.

95.     Defendants intentionally and knowingly misled consumers by making untrue and misleading statements and failing to disclose material facts regarding the prices of their apparel and retail products with intent to mislead Plaintiff and members of the proposed Class.

96.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and members of the proposed Class, about the price of their apparel and retail products. Plaintiff and members of the proposed Class reasonably relied upon Defendants' artificially inflated reference prices and false discounts when purchasing the apparel and retail products from Defendants' retail stores. Plaintiff and members of the proposed Class would not have made such purchases but for Defendants' representations regarding the substantial discount being offered for the product.

97.     Defendants' violation of the NYFAA, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff, members of the proposed Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and led to financial damage for consumers like Plaintiff and members of the proposed Class.

98.     As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive and unfair acts and practices made during the course of Defendants' businesses, Plaintiff and members of the proposed Class suffered ascertainable loss and actual damages.

99.     Plaintiff and members of the proposed Class are entitled to all of the damages, remedies, fees, and costs available under NYFAA, including but not limited to, injunctive relief,

recovery of actual damages and/or five hundred dollars per violation, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## VI.    PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the proposed Class, requests that this Court award relief against Defendants as follows:

a.    an order certifying the Class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

b.    awarding Plaintiff and the proposed Class members damages;

c.    awarding restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiff and the proposed Class members as a result of their unlawful, unfair, and fraudulent business practices described herein;

d.    awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their misconduct and pay them all money they are required to pay;

e.    awarding actual, punitive and statutory damages as permitted under the New York False Advertising Act and the New York Consumer Protection from Deceptive Acts and Practices Act;

f.    ordering Defendants to engage in a corrective advertising campaign;

g.    awarding attorneys' fees and costs; and

h.    for such other and further relief as the Court may deem necessary or appropriate.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all of the claims so triable.

Dated: December 6, 2023

**LYNCH CARPENTER LLP**

By:  _/s/ Gary F. Lynch_

Gary F. Lynch (NY 5553854)
gary@lcllp.com
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Tel.:    (412) 322-9243

Todd D. Carpenter (*pro hac vice* forthcoming)
todd@lcllp.com
Scott G. Braden (*pro hac vice* forthcoming)
scott@lcllp.com
1234 Camino del Mar
Del Mar, California 92014
Tel.:    (619) 762-1910
Fax:    (619) 756-6991

*Attorneys for Plaintiff and*
*Proposed Class Counsel*